BATAVIAN BANK, Respondent, vs. McDONALD and another, imp., Appellants.

*September 23 — October 14, 1890.*

*Promissory notes: Extension of time for payment without consent of sureties: Payment of interest in advance.*

In an action by a bank against accommodation indorsers of notes, it appeared, among other things, that after maturity thereof the maker paid interest thereon for ninety-three days in advance. He testified that the plaintiff's cashier had agreed to extend the time of payment if the interest was paid in advance. Upon such payment

Batavian Bank vs. McDonald and another.

being made the dates upon the backs of the notes, showing the times
when they became due, were changed to the dates to which interest
was so paid, and the notes were placed with others becoming due
at those times, and no demand of payment was made until about
those dates. The cashier testified that he had told the maker that
if he wanted an extension he must get new notes indorsed by the
same parties, and that he did not intentionally extend the time.
The indorsers had no knowledge of and did not consent to any ex-
tension. *Held*, that the evidence did not warrant a verdict against
the indorsers, it appearing that there had been an extension which
released them.

APPEAL from the Circuit Court for *La Crosse* County.
The following statement of the case was prepared by
Mr. Justice TAYLOR as a part of the opinion:

This action was brought to recover the amount claimed
to be due upon two promissory notes, one for the sum of
$1,000, bearing date on the 6th of July, 1888, payable in
sixty days after the date thereof, with interest after ma-
turity at the rate of eight per cent. per annum, and one
for the sum of $1,500, bearing date the said 6th day of
July, 1888, payable in ninety days after the date thereof,
with interest after maturity at the rate of eight per cent.
per annum. Royal L. Reynolds was the maker of each of
said notes, and they were made payable to the order of
the defendants *McDonald*. The notes were duly indorsed
by the said *McDonalds*, and were afterwards delivered by
the said Reynolds to the plaintiff bank in the usual course
of business, and the same were discounted by said bank for
the said Reynolds, and the proceeds of said notes were by
said bank credited to said Reynolds. There is no conten-
tion made by the respondent, the bank, but that the appel-
pellants, the *McDonalds*, indorsed these notes for the ac-
commodation of the said Reynolds, and that the bank knew
this fact at the time it discounted the notes for the benefit
of said Reynolds. It is freely admitted that the *McDon-
alds* were in fact the sureties for the said Reynolds for the

payment of said notes. The only defense made by the said appellants is that the bank, for a valuable consideration received from said Reynolds after said notes by their terms became due and payable, extended the time for the payment of the $1,500 for ninety days after the same became so due on the 6th of October, 1888, viz., to the 8th of January, 1889, and the $1,000 note from the 6th of September, 1888, to the 10th of February, 1889, and that such extension of payment was made without the knowledge or consent of the said *McDonalds*.

The evidence of the extension of time for the payment of these notes on the part of the appellants is the testimony of Reynolds, corroborated and confirmed by the acts of the bank in regard to these notes after the same became due, and the only evidence for the plaintiff that there was no agreement to extend the time of payment by the bank must be found, if found at all, in the testimony of Bentley, the cashier of the bank.

Upon this subject of the extension of time for the payment of these notes, Reynolds, on his direct examination, testified as follows: " Question. On the 18th day of October, 1888, it is alleged in the complaint that you paid the sum of $20.67 on this $1,000 note. It is also alleged that on the 18th day of October, 1888, you paid $31 on the $1,500 note. Under what circumstances did you pay that? Answer. I paid that for the interest in advance on the notes for the extension. Q. For an extension up to what time? A. It was ninety days, if I recollect right. Q. The $1,000 note, it is alleged, you paid the sum of $20.67 on the 18th day of October, 1888, and the sum of $14 on the 6th day of December, 1888. For how many days did the $20.67, paid on the 18th day of October, 1888, extend the note, as you understand it,— the $1,000 note? A. Ninety days, I understood it. I paid this first instalment of interest to Mr. Wing, the collector, I think. That is my recollection. These

statements of payments, as made in the complaint, are correct. The time I paid up in October, my impression is Mr. Bentley himself figured up the interest, and made out a check for the amount in my small stub-book or check-book I carried in my pocket. I have never found the check that was given that day. I have searched for it. That is the stub of the check-book that I used at that time. The amount of the check given by me on that day was $79.67. This amount covered the interest on this note as well as the interest on other notes. I had a talk with Mr. Bentley at that time, or about that time, in regard to carrying me on this paper. This was the substance of that talk: I wanted him to carry me until I finished the government building, which would be the next July, as I told him the percentage they kept back, which was ten per cent., would be about $10,000, and would be more than enough to pay the notes. He said if I would pay the interest in advance they would carry me. Nothing further was said that I recollect. The payments mentioned in this complaint were paid as interest on these notes. I don't know for how many days this first payment on the $1,000 note paid the interest,— whether ninety or ninety-three. I asked for ninety days, and I suppose they charged for ninety-three. The $14 paid on the 6th of December, 1888, would carry it sixty days. The payment of $31 made on the $1,500 note, October 18th, would carry that note ninety days."

On the cross-examination he testified as follows, viz.: "The conversation I had with Mr. Bentley on the 18th of October, 1888, is the time I spoke to him about carrying me until I got through with the government building. It is hard to give the exact words of the conversation, under the circumstances. We were not then expecting any trouble at all. I think I have, in substance, given all that was said in that conversation. I don't think I can give the exact words, any more than I asked them to extend my paper,

and he said he would if I paid the interest. I also told him I wanted to be carried till I got through with the government building. I do not recollect whether anybody else was there or not, besides me and Mr. Bentley. No, sir; there was nothing said in that conversation on October 18th about *McDonald Bros.,* that I recollect of. Mr. Bentley did not tell me that he could not give an extension, and if I wanted an extension I must go and get the consent of *McDonald Bros.,* or a new note indorsed by them; and what makes me think it is so is because I never went near them. I am positive, if he had asked me, I should have gone and done it. I don't recollect any such conversation." " I think I had conversations with Mr. Bentley once or twice after the 18th of October, about these notes. I think I extended them once or twice after that. I always consulted him when I did extend them. I know I never extended a note without asking Bentley about it. That has been my custom always in doing that. These two particular notes simply run along after October 18th. I have a memorandum as I understood how the notes were extended. I cannot tell without referring to some minutes I have. I made them as I put them down at the time on the stubs, when I paid the interest on the notes. I drew it off onto this from this paper. This is my handwriting [indicating for interest to pay certain amounts]. When I paid the $79.67, as I understood that was the way I paid interest at that time, I know it was not in my writing or Mr. Bell's, the book-keeper's, but I think it in Bentley's, and that memoranda in my hand is something taken from this."

In addition to the testimony of Reynolds, it was shown that at the time these notes became due, in September and October, the defendants the *McDonalds* were requested to waive notice of protest, and they did so. The notes were presented to the agent of the *McDonalds,*— one the 7th of September, and the other on the 6th of October, 1888, —

and he was requested to waive protest and notice, and he did so. The agent of the bank said: "Mr. Reynolds was not ready to pay them until he received his estimates, and they would be paid." After that neither the *McDonalds* nor their agent heard anything about these notes until the 8th of January, 1889, when the $1,500 note was presented to the agent of the *McDonalds* for payment. The $1,000 note was not presented for payment to the *McDonalds* at all after the 7th of September. The cashier, Bentley, testified as follows: "'September 7th' was put on the back of the note to indicate the date when the note was due. 'December 9th' was put on the back of the note because the interest was paid until the 9th of December. It was erased because later interest was paid to February 10th. I presume that interest up to December 9th was paid by Reynolds, and up to February 10th by R. L. Reynolds. I suppose it must have been paid by him. I did not receive it myself. I don't know whether Reynolds called at the bank and had a talk with me about the 7th of September in regard to this note. If he did call at the bank about that time, what officer of the bank he would have had the conversation with, in regard to it, would depend, I presume, on what he wanted to say. He had no talk with me in regard to an extension of this note, about that time, to my recollection. We had such conversation, but I think it was later than that. I had a conversation with him in regard to this note, some time after that. We did not talk particularly of this note, but any notes in general. It may have been a month after. It might have been two or three months. It was some time after the note matured. The general conversation had between him and me at that time was to this purport: Mr. Reynolds was speaking about his affairs, and said that, if he could have the money that he then had until he got his final estimate, it would help him through all right, and wanted to know if we would

allow him to be carried for that amount. I said, in a general way, that perhaps we would if the parties who were indorsers would consent to such an arrangement. There was nothing about the conversation that brings the date of it to my mind. I know it was after the notes matured — after the first note matured, and I think after both. I had no further talk with him on that particular note except as I have stated. I think we had a conversation once or twice. I cannot remember any other conversation definitely, but I have an impression that, in a general way, we had a conversation once or twice about the extension of these notes, but the conversations were substantially the same." "I don't know that I had any conversation with him about the extension of the note at all at the time it fell due. I would generally attend to the extension of paper in the bank, with such a customer as Reynolds. In such a case as that, I would, in almost every instance, attend to it. I am there to control matters of that kind, except in cases where they are so obvious the clerk would understand, but in all doubtful cases it would come to me. In that sense, this was one of the doubtful cases. The note was not extended at the time you are inquiring about." "Question. For what object was the interest paid on it beyond September 7th? Answer. You ask me in regard to the conversation on September 7th, and then you ask why interest was paid. I do not think there was any conversation had on or about September 7th. The note matured September 7th. Our books show whether interest was paid on it at that time. There was some interest paid October 18th, covering interest from September 7th to December 9th. I don't remember whether I had any conversation with Reynolds at that time or not. I cannot tell when these conversations occurred. My best impression is that it was earlier than October 18th. I don't know what was said when he came in to pay the interest

on these notes.   I think he said he would pay so much interest on the note, and I let him."   "I did not ask him for anything on the note until December 9th.   I did not dun him on the note.   I don't know whether I expected him to pay anything on the note until December 9th.   I do not think that it operated in my mind as an extension of the note up to that time.   The object in taking interest, *if I did not expect to extend the note, was because the bank is always anxious to have its interest paid.*   People sometimes pay interest on notes without getting an extension.   Taking the two conversations together, I think there was something of that kind in regard to these notes.   Mr. Reynolds had asked in regard to an extension on these and other notes, and whenever he spoke to me about such an extension I always made it conditional that he have the consent of the indorsers.   I did not attempt personally to get such assent.   I made no inquiry of these persons myself.   I sent no one to them from the bank in regard to such assent."   "I presume Mr. Reynolds paid the $20.67, alleged to have been paid October 18, 1888, on account of the note for $1,000.   It was paid for interest from September 7th to December 9th.   That was interest on the note for ninety-three days.   The amount was arrived at on the basis of interest for that time.   I presume Mr. Reynolds paid the $31 alleged in the complaint to have been paid October 18, 1888. It was paid for interest on the note for ninety-three days, from October 7th to January 8, 1889.   I can tell what entries or memoranda were made in the books of the bank on the 18th of October, 1888, in reference to these two payments.   I haven't the entries here, but in our general cashbook there is an entry like this: 'Interest account; number, giving number of note; Reynolds, $14 or $20.67, whatever the amount is, or $31.'   Simply interest with number of the note, and then $31.   Nothing further is said in that memorandum.   That amount is passed into the general ledger.

That would go in bulk, with all interest received for the period, into the general ledger under interest account. There would be no entry in any private account. The time for which interest was paid, and when the interest expires, is ascertained by the note itself. I keep these notes in books, under dates to which interest is paid. That is simply a bill-book. No entry would be made in it. They would be put in under the dates the interest expired. I never had any conversation with Reynolds in regard to papers, except those already stated. If Mr. Reynolds had any business transactions with any one else besides myself in the bank, it would very likely have been with the collector. Ed. Wing was the collector. I think the interest was paid to him. It was very likely paid in a check, but I think it was passed to the collector, not when he was out on his rounds, but in the bank. I presume from the 1st to the 9th of December there was a notice sent to Reynolds in regard to this $1,000 note. The notice was similar to the one already filed upon that same blank, and would recite what the blank shows there. Filled out, it would read as follows: 'La Crosse, Wis., with the date. R. L. Reynolds, La Crosse. Your note to *McDonald Bros.*, for $1,000, is payable December 9th. Please present this notice on payment of note. E. E. BENTLEY, Cashier.'"

In another part of his testimony, Bentley, in answer to the question, "Did you at any time give Mr. Reynolds an extension of either of these notes?" (this question was objected to by the defendants),— said: "No, sir." And then said further: "Mr. Reynolds asked for an extension on these notes. I told him, if he desired an extension, it would be necessary to get new notes indorsed by the same parties." "Question. Was there any agreement made with him when any of this interest was paid, except simply that you took the interest?" This was objected to, and witness answered: "No, sir. There was not. Q. Did you ever

make any promise to extend the time, except they would bring new notes? A. No, sir." This answer was also under objection. Bentley testified further: "Taking the $1,000 note, the first entry on it is the number of the note. The next the entry of the name of the party to the note — 'McDonald Bros.'— first, and that erased. It was an error that was erased in the bank. Then the word 'due,'— due September 7th. That 'September 7th' is erased, and the word 'due' is left. 'December 9th' is put in after 'September 7th.' That is erased. That was put there by the bank or its officers or book-keeper. Next is 'February 10.' That is not erased. The word 'due' is not erased. 'February 10' is put out to the end of the line. Taking the $1,500 note, it is numbered '23,974,' followed by 'R. L. Reynolds.' Then the words, 'Due, October 7th.' That October 7th is erased, and right after that word 'due,' is 'January 8.' There is an 'N' on that note. It looks as if put there by Ed. Wing,— put there by some one in the bank, I presume. The 'N' is a little mark that the messenger makes to signify that the maker of the note has been notified. There is an 'N' on the other note. I see but one, and that is put in just before the February 10th date. There is one 'N' on each of them. Talking now about the $1,000 note, it was kept, up to the 7th of September, in a little roll in which we kept our notes. It is not a book, although you might call it so. It is a long roll of leather made of the length of the notes, with a tape running through it to spread it into different apartments, and the notes are put in under the date when they become due. After September 7th, and up to December 9th, the note was kept part of the time in one place and part of the time in another; until the interest was paid it was kept in one package, and after the interest was paid it was put back in the package of which I speak. It was put in the general package of notes that fell due on December 9th. In the

usual course of business of the bank, it would be taken out of that package on the 9th day of December. After the interest was paid on December 9th, it was put under the date of February 10th; I presume in the same book. It would remain there until such time as it became due, on February 10th, unless there was some occasion to make a change. The same would apply as to the dates on the $1,500 note. I did not state that when this $1,000 note first became due I told Reynolds that if he desired an extension of the note he must get a new note indorsed by the parties who had indorsed the other. I stated I told him in general in regard to these notes that if he wished to extend them he would have to do that. My impression is that the matter was mentioned more than once. I do not think that I stated in my direct examination that I never had but one conversation with him on that subject. I think I said I had others. My recollection is, I said I thought we had two or three conversations. *My recollection is that I did not have any such conversation with him on the 18th of October, but I cannot swear positively as to that. My recollection is that it was previous to that. According to my recollection I had no conversation with him on that date.* I could not say whether I had any conversation of that kind with him on December 9th. I cannot tell about that, *but I think in a general way I told him he would have to get another note with indorsers.* I took no steps to notify the indorsers on the notes, further than to have them waive protest. No further steps were taken by me at all." This witness says, in another place in his testimony: "As a matter of fact I never gave an extension intentionally."

The foregoing is substantially all the evidence given on the trial, as to the extension of time for the payment of the notes in question. It is admitted that the appellants had no knowledge of the extension of time for the payment of these notes; and it is further admitted that they

did not consent to such extension, if such extension was given.

Upon this evidence the learned circuit judge submitted the question of the extension of time to the jury, and by their general verdict in favor of the plaintiff they must have found that no extension of time had been given by the bank or its agent or agents for the payment of either of said notes.

[The defendants *McDonald* appealed from the judgment entered upon the verdict in favor of the plaintiff.]

For the appellants there was a brief by *Losey & Woodward*, and oral argument by *G. M. Woodward*.

For the respondent there was a brief signed by *Miller, Noyes & Miller*, of counsel, and the cause was argued orally by *M. P. Wing* and *B. K. Miller, Jr.* They contended that it was a question for the jury whether the taking of interest in advance was an extension of time and released the sureties. 2 Rand. Comm. Paper, secs. 954–6, 958–9, 963, 965; 2 Dan. Neg. Inst. (3d ed.), sec. 1315; *First Nat. Bank v. Leavitt*, 65 Mo. 562; *St. Joseph F. & M. Ins. Co. v. Hauck*, 71 id. 465; *Reynolds v. Ward*, 5 Wend. 501; *Chrisman v. Tuttle*, 59 Ind. 155; *Dare v. Hall*, 70 id. 545; *Freeman's Bank v. Rollins*, 13 Me. 202; *Crosby v. Wyatt*, 23 id. 156; *Mariner's Bank v. Abbott*, 28 id. 280; *Lime Rock Bank v. Mallett*, 34 id. 547; *Williams v. Smith*, 48 id. 135; *Nat. Bank v. Dow*, 79 id. 275; *Hosea v. Rowley*, 57 Mo. 357; *Coster v. Mesner*, 58 id. 549; *Oxford Bank v. Lewis*, 8 Pick. 458; *Blackstone Bank v. Hill*, 10 id. 129; *Central Bank v. Willard*, 17 id. 150; *Agricultural Bank v. Bishop*, 6 Gray, 317; *Haydenville S. Bank v. Parsons*, 138 Mass. 53; *Hume v. Mazelin*, 84 Ind. 574; *Crossman v. Wohlleben*, 90 Ill. 537; *Meiswinkle v. Jung*, 30 Wis. 361; *Irvine v. Adams*, 48 id. 468; Brandt, Sur. 442, sec. 329; *Wyke v. Rogers*, 1 De Gex, M. & G. 408; *Sohier v. Loring*, 6 Cush. 537; *Kearsley v. Cole*, 16 Mees. & W. 128; *Rucker v. Robinson*, 38 Mo. 154.

TAYLOR, J. After a careful consideration of all the evidence in this case, we are very strongly impressed that the verdict is not supported by the evidence, and ought to have been set aside by the learned circuit judge on the motion of the appellant. Everything which was said and done by the bank officers at the time the interest in advance was paid on these notes on the 18th of October, 1888, shows very clearly that not only Mr. Reynolds understood that in consideration of the payment of such interest the time for the payment on such notes should be extended, but the bank or its agents so understood it, and gave Reynolds the right to so understand it. In the first place, Mr. Bentley, the cashier, does not in his testimony in any way contradict Mr. Reynolds as to what conversation was had between them at the time the interest was paid; and Reynolds says: "Bentley told me if I would pay the interest in advance they would carry me." Again, he says: "I asked them to extend my paper, and he said he would if I paid interest." As affirming the truth of the statement made by Reynolds, we have the fact that the indorsement on the back of the notes of the time when the same would become due was changed on the $1,000 note from September 7, 1888, to December 9, 1888, and then again from December 9, 1888, to February 10, 1889, and on the $1,500 note from October 7, 1888, to January 8, 1889. This was not only done immediately upon the payment of the interest in advance, but the notes were placed with other notes becoming due at the same time, to wit, December 9, 1888, and January 8, 1889; and it is fully admitted that thereafter no call, either upon Reynolds or the appellants, for the payment of these notes was made until the $1,500 note was about due, January 8, 1889, and until the $1,000 note was about due, February 10, 1889. All the acts and conduct of the bank officials tend very clearly to establish the contention of the appellants that the time for the payment of these notes was extended as claimed by them.

To our minds there is nothing in the evidence of Bentley, the cashier, which tends to overturn the conclusion which follows from the evidence on the part of the appellants. His statements that he did not intentionally extend the time certainly cannot be permitted to do away with the effect of the facts proven, which clearly establish the fact that an extension was granted.   As to his other answer to the question, " Did you at any time give Reynolds an extension of either of these notes?" that he " did not," it is probable that the question should have been ruled out by the court; but, admitting that it was a proper question to be answered by the witness, his answer to the next question propounded shows that he based his first answer upon his claim that, at some time before this interest was in fact paid, he had had a general conversation with Reynolds about extending his notes generally; and that in such conversation he had told Reynolds that if he wanted any extension he must get new notes indorsed by the same parties. Bentley nowhere in his evidence pretends to say what conversation was had when the interest was paid on these notes, but says he does not recollect what was said.   The testimony of Reynolds as to what was said then is not overcome by an allegation that something else was said at another time.   It seems to us very clear that having taken the interest from Reynolds in advance upon these notes without requiring any consent from the indorsers, or without requiring Reynolds to get the notes renewed by the indorsers, is strong evidence tending to estop the bank from insisting that there was no extension of time, and that, after receiving such interest in advance, followed by the other acts of the bank in regard to these notes, no court would sustain an action on them against Reynolds until the time for which the interest had been paid in advance had expired, unless the bank could show affirmatively and clearly that, notwithstanding such receipt of interest in ad-

vance, the bank reserved to itself the right to bring an action at any time on such notes within the time for which the interest had been paid. The payment of the interest in advance, and the receipt of the same by the bank, without further proof, would not only justify a court in holding that the time for payment had been extended, but standing alone would be conclusive as to the extension. Brandt, Sur. § 305, and cases cited; *Blake v. White*, 1 Younge & C. 420; *Crosby v. Wyatt*, 10 N. H. 323; *Wakefield Bank v. Truesdell*, 55 Barb. 602; *Siebeneck v. Anchor S. Bank*, 111 Pa. St. 187; *Randolph v. Fleming*, 59 Ga. 776; *Woodburn v. Carter*, 50 Ind. 376; *Warner v. Campbell*, 26 Ill. 282; *People's Bank v. Pearsons*, 30 Vt. 711; *Rose v. Williams*, 5 Kan. 483; *Christner v. Brown*, 16 Iowa, 130.

This being the rule, there does not seem to us to be any evidence in this case which should be permitted to defeat the appellants' claim that the time for payment had been extended without the assent of the sureties. It is possible that the cashier, Bentley, did not intend to release the sureties on the note, but it seems to us very clear that he consented to an extension of the time of payment to Reynolds when he received the interest in advance, and if he so extended the time to Reynolds with no intent to discharge the sureties, still the sureties are discharged in law by the extension of time of payment to the principal debtor without their assent, and the intention of the cashier cannot change the result.

We think there is a great deal of good, sound sense in the remarks of Lord Baron LYNDHURST, in the case of *Blake v. White*, above cited. He says: " If it appeared simply that six months' interest had been given, what could the imagination suggest but a contract *ipsissimis verbis* that the creditor should not sue for that time. Besides, the interest being paid, would a court of equity endure that the creditor should put that interest into his pocket, and the next

day sue for the principal?" We think, clearly, neither a court of equity or law would permit such a proceeding unless there was the clearest proof that such was the agreement between the creditor and his interest-paying debtor at the time the interest was paid and received in advance. We are satisfied that there is no evidence in this case which ought to sustain a verdict that such agreement was made between the parties, or that there was any such understanding between them when such interest was paid and received in this case.

We think the learned circuit judge should have set aside the verdict in this case on the ground that it was entirely unsupported by the evidence.

*By the Court.*— The judgment of the circuit court is reversed, and the case is remanded for a new trial.